## Commonwealth v. Goodyear Tire and Rubber Company

*Richard C. Fox, McNees, Wallace & Nurick,* for appellant.

Edward T. Baker, Deputy Attorney General, for Commonwealth.

BOWMAN, J., December 11, 1967.—Is one who retreads tires engaged in manufacturing or processing within the meaning of the Tax Act of 1963 for Education [1] which exempts such activities from taxation? This is the issue in an appeal by the Goodyear Tire and Rubber Company from the action of the Board of Finance and Revenue in sustaining a sales and use tax assessment levied against appellant by the taxing authorities.

Incident to this appeal, the parties have agreed to waive a jury trial,[2] have stipulated a substantial number of facts which we adopt, and, at a hearing, appellant presented additional evidence consisting of testimony by an expert witness and several exhibits. The uncontradicted additional evidence is descriptive of the mechanics of tire retreading operations and of the physical and chemical properties and changes involved. The stipulated facts and additional evidence may be summarized as follows:

Appellant, an Ohio corporation qualified to do business in Pennsylvania, operates plants in our State wherein motor vehicle tires are retreaded. A retreading operation involves the combining of a retreading material, known as "green tread", with a worn tire carcass and the chemical and physical alteration of the green tread and the carcass through the process of vulcanization. The mixing, heating and extruding of green tread, which has as its principal ingredient either natural or synthetic rubber, is done outside of Pennsylvania and is shipped into Pennsylvania in

[1] Act of May 29, 1963, P. L. 49, formerly known as the Selective Sales and Use Tax Act of March 6, 1956, P. L. (1955) 1228, as amended, 72 PS §§3403-1, et seq.

[2] As provided by the Act of April 22, 1874, P. L. 109, 12 PS §688.

468

rolled strip form. The tire carcasses with which the green tread is combined are worn ones obtained primarily from retail stores which have taken them as trade-ins.

The first step in the tire retreading process is the selection of a usable worn tire carcass. This consists of a visual inspection of the carcass for nonrepairable nail holes, carcass breaks, ply separation, bead damage or other basic defects.

A carcass which is determined to be sound is next subjected to a machine buffing operation, in which the old tread design and remaining upper sidewall are ground off and the carcass is given a particular contour. However, a layer of the old tread material is left on the carcass, and it is this material that will be chemically bonded to the green tread in the vulcanization stage.

After the carcass has been buffed, it is coated with a thin layer of rubber base cement and the green tread is applied to the buffed surface and wrapped tightly around the carcass. The purpose of the cement is to provide tack so that the green tread will not separate from the carcass prior to the time that vulcanization occurs. Separation at this point would prevent a complete chemical bond from occurring at the vulcanization stage, and the completed tire would be likely to fail in service as flex strains would cause the separation to become enlarged.

The under part, cushion side, of the green tread that is applied to the prepared carcass has a thin layer of a natural rubber compound, the chemical properties of which are designed to enhance tacking and vulcanization bonding. The outer portion of the green tread is designed to provide maximum qualities of wear and abrasion resistance.

After the green tread has been cemented to the carcass, the vulcanization stage occurs. Here a dual result

is obtained; the green tread is chemically bonded to the carcass and undergoes chemical changes through which it takes on the properties and qualities of automobile tire tread.

Vulcanization basically consists of the application of a certain amount of heat over a certain period of time to obtain an automobile tire of desired quality. Upon the application of heat, chemical reactions are brought about in both the carcass and the green tread, and a molecular cross-linkage occurs through which these materials are bonded together chemically. In addition to the creation of this chemical bond, other physical and chemical changes also occur in the carcass and green tread material. Upon the completion of vulcanization, the tire will exhibit certain qualities of hardness, abrasion resistance, tensile strength and elongation at break, and the combination in which these properties will occur depends upon the precise amounts of time and temperature which are applied to the green tread and carcass. These changes occur with respect to both the carcass and the green tread material, although the changes occur in a lesser degree in the case of the carcass which has already been subjected to vulcanization at an earlier point in its life span. The only operation in which heat is used is in vulcanization.

When vulcanization has been completed, the tire is given a final inspection and is ready for highway use as a retreaded tire, this being the same purpose and use for which the carcass as an original new tire and as a worn tire was designed and used.

While only a basic flaw in the worn carcass of the original tire would preclude its being used for retreading regardless of its original quality, there is usually a relationship between the quality of the green tread applied to the worn carcass and the quality of the original tire. It is possible, although generally eco-

nomically unrealistic, to apply green tread of a higher quality to the worn carcass of an original tire of lesser quality.

The retail price differential between new original tires and retreaded tires ranges from 25 percent to 30 percent in tires of lesser quality and as much as 50 percent or more in so-called premium tires.

Appellant has exhausted its procedural rights and remedies before the appropriate administrative agencies and by timely appeal to this court seeks to have the sales and use tax assessment partially set aside, as well as the resulting interest charge applicable thereto.

It is appellant's primary contention that the third step in the operation of retreading a tire, the vulcanization, constitutes manufacturing within the meaning of the taxing statute.

Section 2 of said act (72 PS §3403-2) excludes from taxation the sale or use of personal property employed in the "manufacture of personal property" and in clause (c) defines "Manufacture" to mean:

"The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired. . . ."

In the leading case of Commonwealth v. Sitkin's Junk Co., 412 Pa. 132 (1963), the Supreme Court held that acts performed in transforming unsorted scrap into metal scrap usable in the making of steel were "other operations" constituting manufacturing within the statutory definition. In declaring that the "new *and* different" test as to what constitutes manufacturing as established by a long line of decisions under other statutes was not controlling, the court said, page 138:

"By specifically defining 'manufacture', the legislature indicated its intent that 'manufacture' be construed in accordance with the statutory language and that the construction of such word was not to be controlled by prior judicial construction of such word under prior tax statutes. By way of example, the Act provides that the finished product be 'different' from that form in which it was acquired whereas under prior judicial construction the finished product had to be both 'new and different.' . . .

"In its definition of 'manufacture', the Act (Section 2(c)) emphasizes two criteria, i. e., the type of the activity and the result of that activity. To consitute 'manufacture', first, the type of the activity must fall into one or more categories, i. e., 'manufacturing, fabricating, compounding, processing or other operations' and second, as a result of one or more types of the prescribed activities, the personal property must be placed 'in a form, composition or character different from that in which [such personal property]' was acquired".

Applying this dual test to the instant case, it must first be determined whether the type of activity involved in tire retreading constitutes manufacturing, fabricating, compounding, processing or other operations.

The Sitkin decision indicates that "other operations" as an activity meeting the first test laid down is to be given a broad meaning not limited to the scope of the words preceding this phrase in the statute. The ejusdem generis rule of interpretation was specifically rejected as contrary to the manifested legislative intent and the common dictionary definition of "operation" was adopted as meaning "the action of making or producing something".

As so broadly defined, we believe that "other operations" includes the activity of appellant in the instant

case in taking the worn carcass of a tire and subjecting it to the enumerated steps which results in an end product of a usable retread tire. Appellant's activity, therefore, meets the first test laid down in Sitkin.

This brings us to the second test. As a result of such "operations", does a product emerge which is different in form, composition or character from that with which the operation began?

The Commonwealth contends that it does not. It argues that appellant started with a tire, albeit a worn one, and ended its operations with a tire, a retreaded one, which is not a *different* product in that its form, composition and character are essentially the same.

Appellant, on the other hand, relying essentially upon the vulcanizing step in the retreading operations, argues that a different product emerges because of physical and chemical changes wrought thereby not only to the green tread but to the carcass as well. It also points out, quoting from Sitkin,[3] that "that which was useless has been rendered useful. . . ."

An extended discussion is not needed to properly conclude that a retreaded tire is *not* substantially different in *form* or *character* from that of the worn tire to which, in the retreading operation, a green tread has been applied. Its outward appearance and visible qualities or traits are the same as is its shape and structure. To the eye it would have, on an inspection, a deeper tread than that of a "worn" tire, but it remains essentially the same and is designed to serve the identical purpose of the original but then worn tire. The nicety of the depth of tread is not sufficient, in our opinion, to conclude that it is a *different* product in form or character from that of the original but worn tire with which the tire retreading operation commences.

---

[3] 412 Pa. 132 (1963), at page 141.

Does vulcanizing produce a different product because of a change in "composition"?

While the mixing, heating and extruding of green tread is done outside of Pennsylvania and it is thereafter shipped into this State in rolled strip form to put it to the ultimate use for which it is intended as an integral part of a retreaded tire, it must be (a) bonded to the worn tire carcass, and (b) subjected to marked physical and chemical changes to produce the desired qualities of the tread itself. Until this is done, the worn tire carcass has little, if any, economic value and the green tread, while of economic value, remains unused for its intended purpose. Both of the mentioned objectives are achieved by vulcanization and it is only after vulcanization of the green tread that its intended use will bear fruition.

We have already discussed vulcanization and the chemical and physical changes wrought thereby to the green tread itself and to a lesser degree to the worn tire carcass to achieve bonding. It is only after this step in the tire retreading operation that the two major components, the worn tire carcass of little, if any, economic value or utility, and the green tread, until then not usable for its ultimate purpose, combine to form a usable product, a result which neither of the major components enjoyed in their respective states prior to the commencement of the tire retreading operation.

In our opinion, this is not, as the Commonwealth would have us conclude, simply starting with a tire with a relatively smooth tread and ending with a tire with a relatively deeper tread. Rather, we believe that a different product emerges because the composition of a major component, the green tread, without which there would be no end product, is unquestionably changed in both physical and chemical properties. To a lesser extent, but nevertheless vital to achieve the

bonding of the green tread to the worn carcass, chemical changes are effected in the worn tire carcass itself. Vulcanizing in the tire retreading operation is not simply the application of heat but a highly technical combination of applied heat and chemicals to produce a usable product out of essentially two components, each of which in itself is not a usable product. We reach this conclusion by utilizing the common usage of the word "composition" as contained in the statute. Composition is "the formation of a whole esp. by different things being put together; the manner in which something is composed or compounded; the particular arrangement or combination of parts of a unit or whole": Webster's Third New International Dictionary.

Because of the conclusion herein reached, it is not necessary to consider appellant's alternate contention that its tire retreading activity is "processing" under section 2 (c.1) (3) of said act.

For the foregoing reasons, we make the following

## CONCLUSIONS OF LAW

1. The personal property of appellant used directly in its tire retreading business conducted in Pennsylvania is not subject to taxation under section 201 (b) of the Tax Act of 1963 for Education as it is used in the manufacture of personal property within the meaning of section 2 (c) of said act.

2. The refusal of the Board of Finance and Revenue to grant appellant relief from the assessment of sales and use tax made against it by the Bureau of Sales and Use Tax of the Department of Revenue, together with interest thereon, was improper and unlawful.

## ORDER

And now, December 11, 1967, the taxpayer's appeal is hereby sustained, and as stipulated by the parties as to taxpayer's liability depending upon determina-

tion of the legal issues involved, it is hereby directed that judgment shall be entered in favor of the Commonwealth and against appellant in the amount of $737.62 sales tax and $689.45 use tax, with appropriate interest as allowed by law and thereupon marked satisfied of record as having been paid, unless exceptions be filed to this order within 30 days hereof. The prothonotary shall forthwith notify the parties hereto or their counsel of this order.